# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10384-PBS |
| | ) | |
| | ) | |
| DANIEL KAMEN, | ) | |
| Defendant. | ) | |

## GOVERNMENT'S MOTION TO EXCLUDE TESTIMONY[1]

The United States of America, by and through its attorneys, United States Attorney Michael J. Sullivan and Assistant United States Attorney Paul R. Moore, hereby respectfully submits this Motion to exclude or limit the testimony of two of the defendant's expert witnesses, specifically, Dr. Irwin Goldstein and Dr. Carol Ball. The government has not received notice that either of these individuals are likely to testify[2], but the government anticipates the possibility that they (or others of similar specialization) may be called to testify on behalf of the defendant, Mr. Kamen.

In the previous trial, Dr. Goldstein described himself as a specialist in urology and sexual medicine. Trial Transcript at 2-9. Dr. Ball described herself as a psychologist specializing in the treatment of people with problem sexual behaviors. Trial Transcript at 2-56.

Both experts came into contact with the defendant following the charging of this matter

---

[1]The government bases its Motion largely upon the presumption that the testimony of the two defense expert witnesses in the second trial (if called by the defendant) would be similar to that proffered by those same witnesses in the first trial.

[2]The government presumes for purposes of this Motion that the defendant will call the same witnesses, even in the absence of a formal notification prior to the second trial.

and offered testimony which was largely, in effect, retrospective in hypothesizing as to the

defendant's state of mind and physical condition at the time of the offense conduct (particularly

from Dr. Ball). Through the testimony of Dr. Goldstein, the jury heard exhaustive testimony

regarding the two surgeries performed on the defendant's penis as well as other painful

procedures and the likely sexual function of the defendant's penis. Then, through the testimony

of Dr. Ball, the jury heard extensive testimony regarding the alleged abusiveness of the

defendant's father, the defendant's social awkwardness and communication difficulties and other

hindrances related to Asperger's Syndrome.

The government believes, respectfully, that neither testimony was helpful to the trier of

fact and that the testimony - if offered again - tends instead to confuse the issues and to create

impermissible sympathy for the defendant.

## <u>RELEVANCE OF THE EXPERT TESTIMONY</u>

The Federal Rules of Evidence provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

<u>Fed R. Evid. 702.</u> However, even if the expert testimony is admissible under Rule 720, it

may be excluded under Rule 403. Rule 403 states that "[a]lthough relevant, evidence may be

excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of

time, or needless presentation of cumulative evidence. <u>Fed R. Evid. 403.</u>

The government does not challenge the expertise of either Dr. Goldstein or Dr. Ball in their previously stated areas of expertise (although the government does not concede the expertise of Dr. Ball in the diagnosis and/or treatment of Asperger's Syndrome).

Here, the defendant will presumably seek to again present evidence regarding his physical and mental condition - and seeks to use post-offense conduct analyses and treatment to establish his mental aptitude at the time of the offense conduct (going particularly to the element of "knowingly").

Evidence submitted to illicit sympathy from the jury is, of course, inadmissible. United States v. Buljabasic, 808 F.2d 1260, 1268 (7th Cir. 1987). Defendant's evidence of his physical and mental conditions some time after the offense conduct is of no or very limited probative value. As such, this evidence is a waste of this court and the jury's time and tends to confuse the issues and to elicit impermissible sympathy for the defendant.

## TESTIMONY OF THE UROLOGIST

The first expert whose testimony the government seeks to exclude is Dr. Irwin Goldstein ("Dr. Goldstein"). At trial Dr. Goldstein testified at considerable length regarding the Defendant's penile curvature and erectile dysfunction. Trial Transcript at 2-15. He testified extensively to the medical treatments of the Defendant's dysfunctions, including "plac[ing] larger size needles in the penis," a six-hour operation on the Defendant's penis, "metal stitches" in the Defendant's penis, the Defendant's use of Viagra, and even the existence of a "European-like" store in Brookline that sells pornography. Trial Transcript at 2-21, 2-25, 2-26, 2-27, 2-33. It is unclear how any of this evidence has probative value that will assist the Jury in determining whether the Defendant is guilty of receipt of child pornography. Dr. Goldstein did testify that he

suggested to the Defendant that he view pornographic material, but he did not suggest for the Defendant to obtain *child* pornography.  Trial Transcript at 2-51.

Further, this witness - although he had many years of expertise in the field of sexual dysfunction and had treated thousands of patients with varying problems and although his clinic facilitated the treatment and/or diagnosis of physical *and* psychological conditions which contributed to sexual dysfunction - had never heard of Asperger's Syndrome, which the Defendant claims to suffer from.  Trial Transcript at 2-39.  Asperger's Syndrome is the condition which the defendant, through the testimony of Dr. Ball, argued prevented him from forming the requisite knowledge element that constitutes an essential part of the charged crime.

It is also quite possible that an aim of the defendant in presenting Dr. Goldstein's testimony was (is) to demonstrate the defendant's sexual dysfunction in an attempt to allay any concern that the finder of fact may have had that the defendant could somehow act as a sexual predator.  In this matter, such conduct is certainly not charged nor is any of the government's case designed to appeal to such concerns.[3]  Thus, the presentation of the defendant's presumed sexual dysfunction seems particularly irrelevant.

### TESTIMONY OF THE PSYCHOLOGIST

The government also seeks to exclude testimony of Dr. Carol Ball ("Dr. Ball").  Dr. Ball testified to the defendant's family history (despite never having met with the defendant's father), depression, anxiety, and her finding that the defendant suffers from Asperger's syndrome.  Trial Transcript at 2-61, 2-78.  Dr. Ball testified to, among other things, the defendant's

---

[3]At the government's closing, the undersigned implored the jury to set aside any prejudices it might have surrounding the general area of sexual exploitation and preferences and to focus solely on that which was charged.  Trial Transcript at 3-16.

4

embarrassment relating to his curved penis, lack of sexual experiences, gambling, and alleged suicide attempts.   Trial Transcript at 2-65, 2-66, 2-68, 2-69.

Dr. Ball's testimony was used to communicate to the jury the father's alleged psychological conditions and abusive approach to the defendant.  Dr. Goldstein testified that, despite having spent no time with the father, that she had offered the following analysis: "Although these deficits may be partially understood in the context of years of intimidation he experienced by his mentally ill father, it was decided to further evaluate Mr. Kamen for a psychiatric and/or neurological or developmental disorder."  Trial Transcript at 2-85.

Repeatedly, through such testimony, Dr. Ball introduced unverified diagnoses of the defendant's father - matters which were not at all within her purview as she was not treating the father (nor had she met him, nor had she even attempted a telephonic interview with him).  Trial Transcript at 2-86.

Such testimony should not be permitted at the second trial.  It represents, at best, a complete guess as to the psychological challenges and alleged abuse of the defendant by someone with whom the witness has not interacted in the slightest.  Rather, the testimony can clearly serve only to establish impermissible sympathy for the defendant.  Perhaps if it rested on a series of independent findings by Dr. Ball or other practitioners, it might arguably have some sort of relevance to the defendant's mental state - although, even then, relevance would be a considerable stretch and confusion of the issues would be quite likely.  Here, the assertions as to the defendant's childhood simply presents an opportunity for the defendant - through Dr. Ball - to make unfounded allegations of abuse without taking the stand himself.  It effectively presents an opportunity for the jury to shift any guilt it may find from the defendant to his father.  For Dr.

Ball to offer herself for the purpose of channeling such grievances to the jury seems particularly impermissible to the government.

Dr. Ball told the jury that Mr. Kamen had attempted to commit suicide on three occasions. There can be no conceivable relevance of that testimony other than to elicit the sympathy of jurors for the defendant, which is impermissible. Here, there was no testimony by Dr. Ball that a symptom of Asperger's Syndrome is that one displays suicidal tendencies. In the absence of such testimony by Dr. Ball, the relevance of the alleged suicide attempts seems quite questionable. During cross examination, despite her unambiguous statement to the jurors under direct examination that the defendant had made three attempts to commit suicide, the witness re-defined "suicide" as not necessarily an attempt to cause one's own death, but rather "an attempt to cause physical harm to oneself. I think often there is not necessarily the idea that one's going to die from it." Trial Transcript at 2-90. Dr. Ball then further qualified her previous assertion to the jury (regarding the three suicide attempts): "It appears that the first one at the gambling establishment was, really, he wanted to end it. The one in the prison, doubtful with the toenail. And the more recent one, he said he didn't want to kill himself, but he did take a lot of pills, and I'm not sure whether he was being honest when he said he didn't want to kill himself." Trial Transcript at 2-90-91.

Subsequently, during cross examination, the witness was asked whether it was ever justifiable for a person in his twenties who identifies primarily with fourteen and fifteen year old males (as the witness had testified that the defendant so identified) to look at sexually explicit pictures of children that age. The following exchange ensued:

A.      It depends on what kind of pictures you're talking about.

6

Q.     So there are some circumstances when it might be okay for them to look at it?

A.     Sure.

Trial Transcript at 2-98.

Such testimony surely revealed the generally confusing, irrelevant and unhelpful nature of much of the testimony of the witness.  Dr. Ball testified at length about the corruptive and abusive influence of the defendant's father (whom she had neither met nor interviewed, although she was not prevented from so doing).  Dr. Ball then testified that the defendant identified primarily with young teenage boys and that there were some circumstances when it would be okay for such a person to view sexually explicit images of teenage boys.

It is true that the cross examination brought these matters into stark clarity through the questioning of the witness - but it is also true that the thrust of the testimony of Dr. Ball presented through her direct examination contained the same assertions, although presented more gently.

As with Dr. Goldstein's testimony, it is unclear how this evidence is relevant to the Defendant's receipt of child pornography.

Dr. Ball also testified that she suggested that the defendant view pornography, but that she never advised him to obtain *child* pornography.  Trial Transcript at 2-99.  Despite her extensive testimony regarding the defendant's mental and emotional condition, Dr. Ball did not specifically address whether the defendant's alleged mental conditions made him incapable of knowingly receiving child pornography, and therefore, could not likely assist the jury in determining the defendant's guilt or innocence.

7

## **CONCLUSION**

The government respectfully requests that the court exclude the testimony of Dr. Ball from the second trial.  If, however, the court should again generally permit the testimony of Dr. Ball, the government would seek to limit Dr. Ball's testimony to the Defendant's alleged mental capability as it regards "knowingly" receiving child pornography (as related to her diagnoses of his state of mind - during the time of her treatment of the defendant).  Dr. Ball should not be permitted to offer various hypotheses to the jury as to what the defendant's state of mind (or relevant mental aptitude) may have been at the time of the offense conduct or how he might merely have ordered child pornography to better relate to those with whom he shared a similar mind set (the witness testified that the defendant was still very much a teenage boy, despite his chronological age).

Dr. Goldstein, having only testified to the physical impairments, challenges, and apparent physical pain of the defendant, should not be permitted to testify.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:      /s/ Paul R. Moore
Paul R. Moore
Assistant U.S. Attorney

December 6, 2007

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served, via electronic filing, upon all parties of record and participating in ECF notification, on December 6, 2007.


By:     <u>/s/ Paul R. Moore</u>
         Paul R. Moore
         Assistant U.S. Attorney

9